# Exhibit A

```
                                                        97
                      - VOLUME C -
             IN THE UNITED STATES DISTRICT COURT
              IN AND FOR THE DISTRICT OF DELAWARE
                            - - -
     LEON STAMBLER,              :    CIVIL ACTION
                                 :
              Plaintiff           :
                                 :
          vs.                    :
                                 :
     RSA SECURITY INC. And        :
     VERISIGN, INC.,             :
                                 :
              Defendants          :    NO. 01-65 (SLR)
                            - - -
                                      Wilmington, Delaware
                                      Wednesday, February 26, 2003
                                      9:00 o'clock, a.m.
                            - - -
     BEFORE:  HONORABLE SUE L. ROBINSON, Chief Judge, and a jury
                            - - -
     APPEARANCES:

              MORRIS, NICHOLS, ARSHT & TUNNELL
              BY:  DOUGLAS E. WHITNEY, ESQ.,
                   JACK B. BLUMENFELD, ESQ.,
                   MARYELLEN NOREIKA, ESQ. And
                   JOHN D. PIRNOT, ESQ.

                        -and-

                                     Official Court Reporters
```

```
                                                        98
 1   APPEARANCES (Continued):
 2
         SHRAGER, SPIVEY & SACHS
 3       BY:  DAVID S. SHRAGER, ESQ.
              (Philadelphia, Pennsylvania)
 4
                  Counsel for Plaintiff
 5
         RICHARDS, LAYTON & FINGER, P.A.
 6       BY:  FREDERICK L. COTTRELL, III
 7
                        -and-
 8
 9       HALE AND DORR LLP
10       BY:  WILLIAM F. LEE, ESQ.,
              DAVID B. BASSETT, ESQ.,
11            DONALD R. STEINBERG, ESQ. And
              MARK D. SELWYN, ESQ.
12
                  Counsel for RSA Security Inc.
13
14       ASHBY & GEDDES
         BY:  STEVEN J. BALICK, ESQ.
15
16                      -and-
17
         FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER LLP
18       BY:  THOMAS W. WINLAND, ESQ. And
              VINCENT P. KOVALICK, ESQ.
19            (Washington, D.C.)
20            Counsel for Defendant VeriSign, Inc.
21                      - - -
22
23
24
25
```

```
                                                        99
 1
 2                    P R O C E E D I N G S
 3
 4        (Proceedings commenced at 9:00 a.m., and the
 5   following occurred without the presence of the jury.)
 6        MR. WHITNEY:  Good morning, your Honor.
 7        THE COURT:  Good morning.
 8        MR. WHITNEY:  We have a few preliminary things
 9   to handle in this period.  Paraphernalia.
10        I understand the last couple days two juries
11   have come back in bifurcated cases with verdicts that
12   suggest that maybe the bifurcation has reduced somewhat
13   the confusion that is likely.
14        My point I would like to make today is that
15   if we are taking that step, we ought not to backslide in
16   other respects in order to introduce confusion that can
17   be kept out, and that's what I'm talking about here today.
18        The first confusion that could arise --
19        THE COURT:  Before we get started talking
20   substantively, because you're on the clock now and I
21   don't know what clock we're on because you have not given
22   me the hours.  So why don't we talk about how long this
23   trial is so that I can start putting you on the clock,
24   talk about practical things and then we can talk about
25   substantive things.
```

```
                                                       100
 1        MR. WHITNEY:  The suggestion that I made was
 2   that we would just proceed in this trial as efficiently
 3   as we could using up as much time as we needed and then
 4   at the end -- splitting the time in half for overall,
 5   two trials, and that then, whatever is left over, we'll
 6   be able to use in the second trial.
 7        MR. LEE:  Your Honor, we actually I think the
 8   system was where your Honor was, it was more specific.
 9   If the trial goes through that Monday, the last -- the
10   next-to-last week in March, I think March 17th, we
11   calculated that there would be approximately 70 hours of
12   time and we proposed, since -- your Honor's two-thirds,
13   one-third, that we go 35 hours for this phase, 25 hours
14   for the second phase and that we split it down the middle.
15        THE COURT:  All right.  Well, the problem is,
16   whenever I give hours, I always include time for the
17   second jury selection and jury instruction and slippage,
18   so if you are counting all the hours -- I don't think
19   it's a good idea because I know lawyers after all these
20   years, you all will be very inefficient the first trial
21   and then will scream about having not enough time for
22   the second.
23        So I won't accept that.  I will add up the
24   hours and give you time.
25        All right.  The second issue we have is
```

**233**

1 the practicing lawyers say, can't do that. Can't do that.
2 You've got to do more.
3 Well, in my courtroom, you are not going to
4 do more any more, so this is the last time I will hear an
5 opening statement like that.
6 All right. Let's bring in our jury.
7 MR. LEE: Your Honor, there's apparently a
8 cable out on the projector. Can we just get a minute?
9 THE COURT: Oh, sure.
10 (Pause.)
11 MS. NOREIKA: Your Honor, can I ask one
12 question? Just so I'm clear, each time we mark an
13 exhibit, would you like me to then offer it at that time?
14 THE COURT: Yes, because it gets confusing if
15 you don't.
16 MS. NOREIKA: Okay.
17 (At this point the jury entered the courtroom
18 and took their seats in the box.)
19 THE COURT: Good afternoon, ladies and
20 gentlemen. You may be seated. You sit down first. You
21 come in, you sit down. You're in charge of our standing
22 and sitting here.
23 Before we begin the presentation of evidence,
24 I thought it would be helpful if I reminded you that the
25 issue in this case is whether defendants' methods which

**234**

1 incorporate the SSL protocol infringe the patents in issue
2 and if so, what damages, if any, should be awarded.
3 Defendants have spoken in their opening
4 statements about plaintiff's motivation in bringing
5 litigation and about the industry's response to the
6 litigation. Those issues, if proven, may be relevant to
7 the issue of damages should you reach that issue, but
8 keep in mind that the question of infringement is the
9 first and primary determination you will need to make. It
10 is an objective analysis comparing the limitations of the
11 claims at issue to the elements of defendants' methods.
12 And I also remind you that you cannot let sympathy or bias
13 or other irrelevant matters interfere with your duty to
14 impartially review the evidence consistent with my
15 instructions of the law that you will receive at the end
16 of the evidence.
17 So I just want to get you on the right track
18 before we start the presentation of evidence and, as soon
19 as our projector is on board, we'll start.
20 (Pause.)
21 THE COURT: Are we all set? I guess.
22 You may proceed.
23 MS. NOREIKA: Your Honor, plaintiff calls as
24 its first witness Leon Stambler.
25 - - -

**235**

1
2 PLAINTIFF'S TESTIMONY
3
4 ... LEON STAMBLER, having been duly
5 affirmed as a witness, was examined and
6 testified as follows ...
7 DIRECT EXAMINATION
8 BY MS. NOREIKA:
9 Q. Good afternoon, Mr. Stambler.
10 Could you introduce yourself and tell the jury
11 something about yourself.
12 A. Yes. Is it all right if I wear this hearing
13 assistance? I don't hear too well.
14 Q. I think you are going to have to be careful that
15 you don't put it near the microphone, because it
16 interferes.
17 A. Okay. My name is Leon Stambler.
18 Q. Can you tell us something about yourself?
19 A. Yes. I'm 74 and a half years old. I've been
20 married for 48 years. I have three children and eight
21 grandchildren, some of who are sitting right there, and
22 I'm proud of them and I hope they'll be proud of me.
23 Q. Can you tell us where you are from, Mr. Stambler?
24 A. Yes. I live in Parkland, Florida, and I was born
25 in a place called Coney Island, in the south part of

**236**

1 Brooklyn. I went to school, public school on the same
2 block that I grew up in and I went to Brooklyn Technical
3 High School in Brooklyn.
4 Q. Can you tell us what Brooklyn Technical High School
5 is?
6 A. Yes. That's a special school that -- for children
7 who show some aptitude in mathematics.
8 Q. And you have to take a test to get in there?
9 A. Yes.
10 Q. How did you come to take that test?
11 A. My mother told me to.
12 Q. Where did you go after you graduated from Brooklyn
13 Tech.?
14 A. Oh, I went on to City College. I studied electrical
15 engineering, a five-year program, and graduated with a
16 Bachelor of Electrical Engineering.
17 Q. Have you gotten any further degrees after your
18 college degree?
19 A. Yes. I got a Master's degree in electrical
20 engineering from Polytechnic Institute in Brooklyn. And
21 then some time afterward, I got a professional degree
22 from Columbia University.
23 Q. What's a professional degree?
24 A. Well, that's a degree that Columbia grants for
25 somebody who starts out on a doctoral program, Doctor of

### 237

1  Science, and I never completed a thesis, so they just gave
2  me a professional degree.
3  Q.  Is that equivalent to a second Master's degree?
4  A.  Yes.  That's like a second Master's degree.
5  Q.  Was your professional degree also in electrical
6  engineering?
7  A.  Yes.
8  Q.  Can you tell us about some of your work experience
9  as an engineer?
10 A.  Yes.  When I graduated from City College, jobs were
11 pretty hard to get in 1950 and I was very lucky to get a
12 job with New York City Department of Public Works as a
13 junior electrical engineer.  My job was to go around to
14 various fire stations and police stations throughout New
15 York City, climb the ladders to the roof and to check out
16 the air raid sirens, to make sure they were working.
17 Q.  How long did you stay at that job?
18 A.  I was there for about six months.  And then another
19 opportunity came up, which was more in line with my
20 education and aspirations.  It was a job with the Federal
21 Government as an electronic scientist at Wright Air Force
22 Base in Dayton, Ohio, and I took that position.
23 Q.  And how long did you stay at that position?
24 A.  I was there about eight months.  That was the time
25 of the Korean War and I was drafted into the Army.

### 238

1  Q.  And you went to the Army?
2  A.  Yes.
3  Q.  What did you do?
4  A.  Well, like everybody else, I went through basic
5  training, Fort Dix, New Jersey.  Then they sent me to work
6  at the Pentagon.  I was at the Pentagon for a short period
7  of time, and then transferred to Baltimore.  And every day
8  I was transported to the Glen L. Martin Company to work
9  with civilian engineers on an advanced radar system.  That
10 was very useful experience and I learned a little bit
11 about engineering.
12 Q.  After you -- you got out of the Army eventually?
13 A.  Yes.
14 Q.  You were honorably discharged?
15 A.  Yes.  I was honorably discharged, private first class.
16 Q.  And what did you do then?
17 A.  Well, I was fortunate to get a job with a company in
18 a field that I was very much interested in.  It was a
19 small company called Electronic Computer Corporation.  And
20 in those years, that was in 1951, computers were very new.
21 And I worked for a company that was the -- one of the
22 early developers of the first general purpose computer.
23 I was very fortunate to work with people who were real
24 innovators and got terrific training on how computers
25 work.  That was a great experience.

### 239

1  Q.  Have you had any other interesting job --
2  A.  So I should mention that in 1954, I helped install
3  one of the computers right close by here, in Philadelphia,
4  at the Westinghouse Corporation.  After working at
5  Electronic Computer Corporation, I took a position with
6  RCA.
7         RCA had just opened a new division in Lower
8  Manhattan and it seemed like a good opportunity.
9         I joined RCA as a -- an entry-level engineer
10 and I worked primarily on Government programs.
                                    - - -
12 A.  Continuing)  After being at RCA, I was promoted to
13 Engineering Group Leader.  I worked on military programs,
14 primarily for the Army.  I did some work for the Signal
15 Corps.
                                    - - -

### 240

2  A.  (Continuing)  I ran a research program for them.
3         I also did some work on cryptography for the
4  Government and I can't talk too much about that because
5  it was a highly classified program.  It was known publicly
6  as the red phone, the President's, and the Joint Chiefs of
7  Staff.
8         I was asked to install that system at the
9  Pentagon, at the Joint Chiefs' facility in London, and
10 Joint Chiefs' facility in Paris.
11 Q.  Have you had any other interesting job opportunities,
12 Mr. Stambler?
13 A.  Yes.  I also had a position with Conn Edison.  Conn
14 Edison, that was a different environment for me.  It was
15 more in the vein of an operating a maintenance environment.
16 I had to deal with making sure the electricity was
17 supplied to people who used electricity and they got their
18 meters read on time and we answered their complaints.  I
19 was responsible for the communications at the generating
20 facilities, such as the nuclear power facility at Indian
21 Point.
22         I had a lot of responsibilities and I reported
23 directly to the Chairman and the President of the company.
24 Q.  And after you left Conn Edison, did you have any
25 other interesting job opportunities?

241

1   A.   Yes.  There was a time that I worked for Blue Cross
2   for a couple of years and also there I was an advisor to
3   executives to help them select computer systems and
4   communication systems for their operations.
5   Q.   And how long did you stay at Blue Cross?
6   A.   Well, I was there only a couple of years, and
7   actually what happened is in prior years I had -- I had
8   diabetes and I think in 1988, I had a heart attack.  So,
9   you know, I had to retire as a result of that because,
10  you know, I felt I should just take it easy for a while.
11       So I left.
12  Q.   And did you retire?
13  A.   Yes.
14  Q.   Did you stay retired?
15  A.   Well, yes.  I was retired actually for about six
16  months, and what happened after a few months, my kids
17  saw that I was bored and they started getting after me
18  and said, you know, dad, you'd better start getting back
19  into things.  We know you're creative and you'd better
20  start creating again and doing things that we know you
21  can do.
22       And about that time, I remember getting a call
23  from my son.  At the time, he was working at Harvard and
24  he had gotten a salary check and he told me about an
25  experience he had.  He went to the bank and he wanted to

242

1   cash his check and they wouldn't cash it because he didn't
2   have two pieces of proper identification.  So he was very
3   unhappy about that.
4        He said, Dad, you ought to think about that
5   problem.  That's a problem that needs to be solved and
6   many people I'm sure will have the same problem.
7        So I put it in the back of my mind.  And as I
8   went around to various places, I saw similar problems
9   that related to this problem.
10       For example, my son-in-law, who's sitting
11  there, I remember he called me once, and he said to me,
12  you know, I have a problem in my office.  We have a Fax
13  machine and he was working at the time as -- in commercial
14  real estate.  And they had a common Fax machine and
15  everybody read Faxes that came in.  He would get many
16  leads on that Fax machine and he said you should think
17  of a way of me getting that Fax so I can keep the
18  information confidential because those are good leads and
19  I'd like to keep it to myself.
20       So I noted that, you know, in exchanging
21  information, confidentiality is a very important thing.
22  And then later on I had a personal experience of my own.
23  I was out of town and I had been taking medicines for
24  my diabetes and my heart ailment, and I ran out of my
25  prescription.  And unfortunately, I didn't have a

243

1   prescription with me and I knew I couldn't go to the
2   pharmacist because he would require a prescription and,
3   you know, he didn't know my doctor.  He didn't know who
4   I was.
5        So I related that problem to the problem that
6   my son had at the bank.  Number one, I'd have to identify
7   myself.  I'd have to identify who the doctor was.  I'd
8   have to make sure that the information for the prescription
9   was correct and that the pharmacist was getting the correct
10  information.  I was also concerned with who would pay for
11  the prescription.  I had insurance and I wanted my
12  insurance company to be able to pay for the drugs.  So I
13  knew that that information about the cost of the
14  prescription and the actual prescription had to in some
15  way be delivered for payment to the insurance company
16  and I thought, you know, that would actually have to
17  involve a computer system of some kind with remote
18  computers talking to each other.
19       So that was another thing that I realized and
20  I realized also that there were many aspects to this
21  problem.
22       Number one, you had to identify parties in the
23  transaction and secure their interests in the transaction.
24  And their interest then to properly identify them, to
25  make sure that the information was not changed, that the

244

1   information was maintained confidential, and
2   authenticated.  And in some way, you'd have to be able to
3   verify that information.
4        And what occurred to me was that it was hard
5   to think about these problems in the abstract and I'd
6   better write it down.  And I wrote down my thinking about
7   it.  I thought, well, maybe I ought to go to the library
8   and see what other people have done before me.  That's
9   what I did and I did some research on what was done
10  before and I found that nobody had the same ideas as I
11  had in terms of coming up with answers.  I came across
12  things like people used special paper with water marking
13  on it so that you couldn't change what was on the paper
14  or they had special stamps and things like that.
15       And even in the patents I researched, I
16  didn't find anything that resembled what I was thinking
17  about.  People on computers talking to each other
18  remotely.  How do they identify each other?
19       So I decided one of the good things I might
20  do is I wanted to see whether what I was thinking was
21  actually practical.  I should write some software programs
22  on my computer and try out these ideas.  And I did that.
23  And I went through many variations.  I must have written
24  six or seven programs over a two- or three-year period.
25  And I tried them and I thought to myself, you know,

245

these ideas are pretty good.

I went to my daughter, who's a patent lawyer, I mean she's a regular lawyer, and I thought -- said what do you think I ought to do with this? She said you have to take it to a patent lawyer and that's what I did. ==I interviewed many lawyers to find the right patent lawyer. I found a fellow who I knew from RCA who had been an engineer and was now a patent lawyer. His name was Joseph Lurge (phonetic) and he worked for a patent law firm, Darby and Darby in Manhattan.== I told him, Look, I'd like to file a patent on this. I'd like to get your opinion on what you think of it.

And I gave it to him and he came back to me and said, yes, he thinks it's patentable. ==And we worked over a period of time. I would see him every week.==

One thing I should mention is after I wrote this down on paper, I gave it to my son because I felt my son was a bright kid and I'd like to have his opinion.

Well, he gave it back to me and said I don't understand any of it. You know, it's too complicated. It's not in my field.

So I thought, you know, I needed a patent attorney for that, who could write it in a way people would understand it. And that's what some of the -- the work the patent attorney did.

246

Anyway, what happened was, I felt that this patent attorney was taking too long to get it written and I was anxious to have it filed. And he was a very busy guy and, even though I kept urging him, it persisted, it was taking too long, it was costing me a lot of money. ==So I decided to change patent law firms and I went to a different law firm in Philadelphia that somebody also recommended to me, a law firm called Panitch Schwarze. And after a few months I was satisfied with what they were doing. And that was November '92 and we filed the patent with the Patent Office.==

Q. Mr. Stambler, I think you told us that before you went to your daughter, that you determined you had come up with something; is that right?

A. Yes.

Q. Do you think you had invented something?

A. Yes, I did.

Q. What was it that you thought you had invented?

A. Well, I thought I had invented a method of securing the interests of many parties to a transaction. And those interests involved authenticating all of the parties in the transaction and, you know, I proved several ways of doing that. One of the ways was to use a personal identification number or a PIN. Another way was to provide credentials for all of the people involved in

247

the transactions. Credential was well known. It goes back in history. Ambassadors would have credentials that they would show to kings at court to establish who they were.

So I thought the idea of using a credential, either physically or electronically, might be appropriate for this kind of a situation. The credential had to be provided by somebody who -- who everybody trusted and that, whoever provided that credential had to vouch for authenticating that particular party. And that was part of the idea in the patent.

So I would identify people with credential or a PIN and I would authenticate the people and the information that was involved in the transaction with something I called a variable authentication number. I thought of that term myself because I thought it most closely describes what I had in mind. It was a number that was generated from a cryptographic algorithm and I will tell you what I mean by that in a minute. And it could be used to -- the number itself could be used to establish the identity of the parties and verify that the information was correct.

And the number, that variable authentication number, could be formed in a variety of ways. One of the ways I thought of was to use what was called an error

248

detection code. An error detection code also was something that I didn't invent, but it was used many times before.

I came across a situation once in a bank where a friend of mine told me how tellers prove their transactions at the end of the day. When they have a transaction, they add up the digits in that transaction and use the last digit of that sum and record that as part of the transaction. Then, at the end of the day, they've got all the transactions they did and they've got the digits that they recorded, but where they called this digit a check sum.

At the end of the day, they would add up all the digits from the transaction and they'd have a total check sum. And then they would add up the sum of the digits or the transaction and if that check sum corresponded to the check sum of all the individual check sums, they were pretty sure that they didn't make a mistake.

So I thought, you know, something like that could be used in terms of verifying the information in a transaction. But I was also aware that there were much more sophisticated error detection codes from my work in communications and computers. I envisioned that that would be used in computers when I wrote the patent.